UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

ALGRO, INC.,

              Plaintiff

v.

PARKER HANNIFIN, INC.

              Defendant

Civil Action No. _____

**JURY TRIAL DEMANDED**

## **COMPLAINT**

Plaintiff Algro, Inc. ("Plaintiff"), for its Complaint against Defendant Parker Hannifin, Inc. ("Defendant"), alleges as follows:

## **INTRODUCTION**

1. Plaintiff is a small, family-owned information technology business based in Milwaukee, Wisconsin. Plaintiff is co-owned by Manoj Kumar and his wife, Neelam Dagar, both of whom are originally from India. Mr. Kumar and Ms. Dagar founded Algro in 2008 and grew the company over the years through their hard work and dedication. In 2012, Defendant, a Fortune 250 manufacturer of motion control technologies, engaged Plaintiff to provide IT services.

2. In 2014, Defendant began looking to transition its supply chain for gears to India. The gears are a key component utilized by Defendant to manufacture a wide array of its products. Seeking to leverage Plaintiff's connections in India, Defendant requested that Plaintiff assist it in

1

finding a suitable gear manufacturer in India to serve as Defendant's new long-term gear supplier. Plaintiff agreed, based on its agreement and understanding with Defendant that Plaintiff would receive a commission on any gears purchased by Defendant from any new supplier identified by Plaintiff and accepted by Defendant. After a year of researching and vetting possible suppliers, in 2015, Plaintiff ultimately selected Bharat Gears Limited ("Bharat"), India's largest gears manufacturer, as its recommended new supplier for Defendant. At this time, Plaintiff and Bharat signed a Non-Compete Agreement pursuant to which Plaintiff would act as Bharat's representative and Bharat would be precluded from conducting business directly with Defendant.

3. Once the Non-Compete Agreement was in place, Plaintiff began to actively coordinate and facilitate Defendant's vetting of Bharat. Plaintiff assisted Bharat in preparing quotes and coordinated meetings, audits, and communications between Bharat and Defendant. Defendant carefully vetted Bharat over a period of five (5) years, an extensive process that reflected the significance of the change in Defendant's supply chain to its business. Plaintiff invested significant time and expense both in identifying Bharat as a potential supplier and in facilitating Defendant's vetting of Bharat as a new gear supplier.

4. As compensation for its efforts, and with Defendant's knowledge and approval, Plaintiff and Bharat agreed to an 8 to 12% mark-up on Bharat's quoted prices to serve as its commission. Clive Hindle, the Global Business Development Head for Defendant's Motions Systems Group, expressly stated to Mr. Kumar that Defendant considered Plaintiff's 8 to 12% commission to be appropriate given the extent of the relationship that Defendant and Parker sought to cultivate through Plaintiff's efforts.

5. While the vetting of Bharat progressed, Plaintiff continued to provide IT services for Defendant. In September 2019, Plaintiff issued an invoice for $37,800 for IT services

performed on behalf of Defendant. Rather than pay the invoice, Defendant told Plaintiff that Plaintiff should be willing to write off this invoice because of the significant revenues that Plaintiff would derive from Defendant's relationship with Bharat, which offered the potential for a far greater return than the unpaid invoice related to Plaintiff's IT services. To date, Defendant has not paid this invoice.

6. In 2020, after five years of extensive vetting efforts coordinated by Plaintiff, Defendant finally selected Bharat as its new gears supplier and began placing orders. Pursuant to Plaintiff's agreement with Bharat, Plaintiff should have begun receiving commissions from Bharat's sales to Defendant at this time. Bharat also agreed that Plaintiff was entitled to receive commissions on Bharat's sales to Defendant and was prepared to pay commissions on those sales. However, notwithstanding Defendant's express statements to Plaintiff that its commission was appropriate and Defendant's assurances that large commissions from Bharat were forthcoming while seeking to avoid payment of one of Plaintiff's IT invoices, Defendant instructed Bharat to cut Plaintiff out of their dealings, likely to avoid paying Plaintiff any commissions on Bharat's sales to Defendant. Bharat followed Defendant's instruction, informing Plaintiff that the "subject is beyond our control," thereby breaching its Non-Compete Agreement with Plaintiff. Following Defendant's instruction, Bharat refused to pay Plaintiff any commission.

7. Defendant was aware of Plaintiff's Non-Compete Agreement with Bharat, and of Plaintiff's status as a representative of Bharat in connection with Bharat's business relationship with Defendant.

8. As a direct result of Defendant's interference, Plaintiff's business relationship with Bharat was terminated. Plaintiff thus has received no compensation for the extensive time and effort it put into cultivating and facilitating the relationship between Defendant and Bharat—a

3

Case 2:22-cv-00250-LA   Filed 02/28/22   Page 3 of 15   Document 1

relationship that would not exist but for Plaintiff's hard work and that has conferred enormous value on Defendant by enabling it to accomplish a significant change in its supply chain. As a result, Plaintiff now files this action to recover the damages suffered by Plaintiff as a direct result of Defendant's deliberate and unlawful conduct, on grounds of tortious interference with contract, civil conspiracy, fraud, and unjust enrichment.

## **PARTIES**

9. Plaintiff is a Tennessee corporation with its principal place of business in Milwaukee, Wisconsin. Plaintiff is co-owned by Manoj Kumar and his wife, Neelam Dagar, both residents of Wisconsin.

10. Defendant is a Fortune 250 manufacturer with production facilities and offices located throughout the United States, including in Wisconsin, and around the world. Defendant is incorporated in Ohio and maintains its principal place of business in Cleveland, Ohio.

## **JURISDICTION AND VENUE**

11. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12. This Court has personal jurisdiction over Defendant pursuant to Wisconsin's "long arm statute", Wis. Stat. §§ 801.05(1)(d), 801.05(4), and 801.05(5)(b), because Defendant submitted to jurisdiction within this state by (1) manufacturing parts marketed and purchased in Wisconsin in the ordinary course of trade, (2) operating multiple facilities and offices located in Wisconsin, and (3) because this action arises out of services Plaintiff performed for Defendant in Wisconsin at Defendant's request. By conducting business in Wisconsin and maintaining

4

manufacturing and sales offices within the state, Defendant exercises substantial, systemic, and continuous contacts with Wisconsin.

13. Venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. §§ 1391(b)(1) and 1392(c)(2) because Defendant resides in this district for venue purposes given that it is subject to the court's personal jurisdiction with respect this action. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the services Plaintiff performed for Defendant at Defendant's request occurred in the Eastern District of Wisconsin.

## FACTUAL BACKGROUND

14. Plaintiffs incorporate by reference, as if fully set forth herein, the allegations in paragraphs 1–13 above.

15. In 2014, after Plaintiff had successfully provided Defendant IT services for two years, Defendant approached Plaintiff with a new request: find a suitable gears manufacturer in India that could potentially serve as Defendant's new long-term supplier for the gears it used in many of its products. Defendant hoped to reduce its manufacturing costs by shifting its gear supply chain to India and knew that Mr. Kumar and Ms. Dagar had connections there. Believing this to be a good long-term opportunity, and relying on Defendant's representation that Plaintiff would receive a lucrative commission on sales made to Defendant by its new supplier, Plaintiff agreed to assist.

16. Plaintiff spent approximately one year expending significant time and resources researching Indian suppliers and speaking with contacts in India before settling on Bharat as its recommended supplier. Before it proposed Bharat as a supplier, Plaintiff and Bharat entered into a Non-Compete Agreement, which precluded Bharat from conducting business directly with Defendant in order to preserve Plaintiff's ability to receive the commissions that were approved

5

by Defendant and which were the sole reason why Plaintiff was willing to expend substantial time and resources to locate a new gears supplier for Defendant.

17. After Plaintiff recommended Bharat to Defendant, in December 2015, Plaintiff (acting in its capacity as Bharat's representative) and Defendant signed a Non-Disclosure Agreement ("NDA") in which Bharat agreed to maintain the confidentiality of Defendant's parts' drawings, specifications, and other proprietary information. Thus began Defendant's five-year long painstaking process of vetting Bharat, a process coordinated and facilitated by Plaintiff.

18. As the first step in this process, Plaintiff worked with Bharat to produce initial quotes on Bharat's gears for two of Defendant's divisions, Chelsea Products and Gear Pump, both part of Defendant's Hydraulics Group. Bharat's quotations included an 8 to 12% mark-up on prices as a commission for Plaintiff. Even with the added commission, Bharat's prices were attractive to Defendant. Clive Hindle, the Global Business Development Head for Defendant's Motions Systems Group, expressly approved the 8-12% commission, informing Plaintiff that even with a 15% commission, Bharat's prices would still be attractive to Defendant when compared to its then-current manufacturing costs.

19. Defendant was pleased with the provided quotes and arranged for a representative to audit Bharat's facility in Faridabad, India, in April 2016. The resulting audit report concluded that Bharat met all of Defendant's specifications. Thereafter, Plaintiff continued to work with Bharat to cement a relationship with Defendant.

20. In March 2016, as Bharat's representative and at Plaintiff's expense, Mr. Kumar attended a symposium in Chicago for potential suppliers to Defendant. His participation led to an invitation, through Mr. Kumar, for Bharat to submit a proposal to Defendant's Hydraulics Group for the provision and supply of gears to other divisions in that group beyond Chelsea Products and

6

Gear Pump. Through August and September 2016, Plaintiff worked closely with Bharat to provide quotations on a number of different gear types. The quotations included the previously agreed 8 to 12% mark-up for Plaintiff's commission.

21. Despite Mr. Hindle's representations that Plaintiff could seek the 8 to 12% commission per part, Defendant asked that Plaintiff work out a flat commission with Bharat.

22. Around the same time, Bharat sought to change Plaintiff's commission rate, claiming purported legal restrictions imposed by the Reserve Bank of India ("RBI") capped the potential commission at 5%. Based on this representation, Plaintiff believed it had no choice but to accept Bharat's request.

23. Meanwhile, Plaintiff continued to facilitate the relationship between Bharat and Defendant, including through its coordination of a visit by members of Bharat's executive team to one of Defendant's manufacturing facilities in Charlotte, North Carolina.

24. In 2017, Defendant and Bharat separately requested that Plaintiff allow them to communicate directly instead of running all communications through Plaintiff. Plaintiff agreed, with the understanding that it would be copied on such communications and be kept apprised of developments in the relationship. Meanwhile, Plaintiff continued to assist Bharat in securing a supply agreement with Defendant, including by coordinating multiple meetings between Bharat and Defendant.

25. Defendant and Bharat's relationship continued to progress, with Defendant planning to place an initial purchase order with Bharat for three sample gears in August 2017. While Defendant decided to limit its initial request to three gear types, it planned to order others in the future barring any issues with the production process and the quality of the samples. Before placing the order, however, Defendant decided instead to continue the vetting process, requesting

that Bharat provide additional parts' drawings and price quotations before it would place a sample order. Defendant finally placed a sample order in August 2019 after setting Bharat up as a gears supplier in its corporate system and executing the required contracts.

26. While Plaintiff worked to cultivate the relationship between Defendant and Bharat, it continued to provide IT services to Defendant. In September 2019, Plaintiff issued a $37,800 invoice for IT services it performed for Defendant's Motion Systems Group. Plaintiff had successfully delivered on phase one of a two-phase project involving data extraction and integration and had recently completed phase 2, for which it sought payment. Defendant did not respond to Plaintiff's repeated requests for payment. Finally, in October 2019, Defendant informed Plaintiff that it had not delivered as promised. Plaintiff disagreed, but it eventually accepted an offer from Defendant for half of the original invoice based on a voicemail from Mr. Hindle in which he told Plaintiff that it should be willing to accept the lower payment based on the lucrative relationship between Defendant and Bharat, which offered the potential for a far greater return, rather than continue to dispute the unpaid amount for IT Services. In the end, Defendant failed to pay even the promised half of the IT invoice.

27. In mid-2020, after five years of vetting efforts and communications, Defendant and Bharat finally entered into a sales agreement, thanks to Plaintiff's substantial efforts. But while Defendant and Bharat were beginning what was intended to be a long-term relationship, Defendant decided that Plaintiff no longer served any purpose. Upon information and belief, Defendant desired to avoid paying a mark-up on Bharat's prices to account for Plaintiff's commission, commission that Defendant continually led Plaintiff to believe it would be paid.

28. Defendant instructed Bharat to cut Plaintiff entirely out of their relationship. Bharat complied with Defendant's instruction, apologizing to Plaintiff and stating that "the subject is beyond our control." Bharat refused to pay Plaintiff any commission on its sales to Defendant.

## COUNT I: TORTIOUS INTERFERENCE WITH CONTRACT

29. Plaintiff incorporates by reference, as if fully set forth herein, the facts set forth in paragraphs 1–28 above.

30. Plaintiff and Bharat signed a Non-Compete Agreement, which prohibited Bharat from doing business directly with Defendant without Plaintiff's involvement.

31. Under the Non-Compete Agreement, Bharat could not "directly or indirectly, whether or not through a third-party, sell or solicit the sale of [Bharat's] products to any of [Algro's] customers," including Defendant.

32. Defendant knew that Plaintiff and Bharat had a business relationship, including an agreement related to Bharat's sale of gears to Defendant, as demonstrated by Defendant's conversations with Plaintiff expressly discussing the commissions Plaintiff was entitled to receive from such sales.

33. Defendant instructed Bharat to cut Plaintiff out of Defendant's dealings with Bharat.

34. Defendant's instruction that Bharat cut Plaintiff out of their dealings caused Bharat to breach its Non-Compete Agreement with Plaintiff, since Bharat continued to work directly with Defendant without Plaintiff's consent after removing Plaintiff from the relationship.

35. Defendant's instruction to Bharat also caused Bharat to refuse to pay Plaintiff the commissions that were agreed upon at the outset of the parties' dealings.

36. Defendant's interference was intentional because it knew of Bharat's agreement with Plaintiff and their business relationship. Defendant explicitly instructed Bharat to terminate its business relationship with Plaintiff and cut Plaintiff out of their dealings. Defendant instructed Bharat to do so because it wished to avoid having to pay a premium on Bharat's prices to cover Plaintiff's commission.

37. As a result of Defendant's interference, Plaintiff has sustained substantial damages for which Defendant is liable, including, but not limited to, the lost commissions Plaintiff otherwise was entitled to receive, in an amount to be established at trial.

## COUNT II: CIVIL CONSPIRACY

38. Plaintiff incorporates by reference, as if fully set forth herein, the facts set forth in paragraphs 1–37 above.

39. Defendant conspired with Bharat to injure Plaintiff's business by instructing Bharat to terminate its relationship with Plaintiff, and by removing Plaintiff from Defendant and Bharat's business dealings in order to preclude Plaintiff from receiving the commissions which it was entitled to receive, in violation of Wis. Stat. § 134.01.

40. Defendant and Bharat acted together with a common purpose to injure Plaintiff's business by cutting Plaintiff out of their dealings and denying Plaintiff the commissions of 8-12% which Defendant and Bharat both agreed, at the outset of Plaintiff's efforts to arrange their business relationship, that Plaintiff was entitled to receive.

41. Defendant acted with malice by virtue of its intent to deprive Plaintiff of the commissions it was entitled to receive and to interfere with Plaintiff's contractual relationship with Bharat, neither of which was a legitimate end.

42. Plaintiff has suffered, and will continue to suffer, financial harm as a result of Defendant and Bharat's actions.

43. As a result of Defendant's and Bharat's actions, Plaintiff has sustained substantial damages for which Defendant is liable, including the lost commissions on Bharat's sales to Defendant that Plaintiff otherwise was entitled to receive, in an amount to be established at trial.

**COUNT III: FRAUD**

44. Plaintiff incorporates by reference, as if fully set forth herein, the facts set forth in paragraphs 1–43 above.

45. In 2014, Defendant requested that Plaintiff locate a new gear manufacturer in India for Defendant.

46. Plaintiff agreed, based on Defendant's representations that Plaintiff would receive a commission on any gears purchased by Defendant from any new supplier identified by Plaintiff and accepted by Defendant.

47. Plaintiff proceeded to spend approximately one year researching and vetting possible suppliers before finally selecting Bharat as its recommended new supplier for Defendant in 2015.

48. Once Plaintiff recommended Bharat to Defendant, Defendant's Global Business Development Head for its Motions Systems Group, Clive Hindle, expressly approved the 8-12% commission Plaintiff was to receive from Bharat's sale of products to Defendant, informing Plaintiff that the 8-12% was appropriate and that even with a 15% commission, Bharat's prices would still be attractive to Defendant when compared to its then-current manufacturing costs.

49. Until 2020, Defendant proceeded to continually represent to Plaintiff that it would receive a commission on all purchases of gears from its new supplier, even to the point of stating,

11

in October 2019, that Plaintiff should be willing to forego payment of amounts due from Defendant for IT Services rendered because of the significant commissions that Plaintiff would receive through the Defendant-Bharat relationship.

50. Despite Defendant's repeated statements to Plaintiff that Plaintiff would receive a commission on all gears Defendant purchased from Bharat, Defendant in fact had no intention of allowing Plaintiff to earn any commission, as confirmed by Defendant's instruction to Bharat to terminate its business relationship with Plaintiff and to cut Plaintiff out of their business relationship entirely.

51. Defendant's misrepresentations to Plaintiff about the commissions that Plaintiff would receive were made with the intent to deceive Plaintiff into expending countless hours over a five-year period for Defendant's benefit, and incurring unreimbursed expenses, in locating a new gear supplier for Defendant, confirming the supplier's capability to serve as Defendant's gear supplier, and facilitating the relationship between Defendant and Bharat that ultimately was consummated in 2020.

52. Plaintiff reasonably relied on Defendant's misrepresentations.

53. But for Defendant's misrepresentations regarding the commissions that Plaintiff would receive in the event that a new gear supplier was successfully identified, Plaintiff would not have undertaken any efforts to locate and vet a new supplier for Defendant.

54. As a result of Defendant's misrepresentations, Plaintiff has sustained substantial damages for which Defendant is liable, in an amount equivalent to the commission Plaintiff otherwise is owed and to be established at trial.

## COUNT IV: UNJUST ENRICHMENT

55. Plaintiff incorporates by reference, as if fully set forth herein, the facts set forth in paragraphs 1–54 above.

56. Plaintiff conferred a significant benefit on Defendant by finding a new Indian gears manufacturer for Defendant at Defendant's request, including, but not limited to, the identification of a new supplier who was able to produce gears for Defendant at a lower cost, thus reducing Defendant's manufacturing costs.

57. Plaintiff expended significant time, energy, and funds in finding Bharat, connecting the parties, and assessing whether it was the right gears manufacturer for Defendant's needs.

58. Defendant was aware of the value of Plaintiff's services, as it was Defendant who originated the request for Plaintiff's assistance.

59. It would be inequitable for Defendant to retain the substantial benefits conferred by Plaintiff's work without payment of compensation for the value conferred by Plaintiff's services.

60. As a result, Plaintiff is owed payment for the value of the benefits conferred by Plaintiff on Defendant, the amount of which will be established at trial.

## COUNT V: PUNITIVE DAMAGES Wis. Stat. § 895.043(3)

61. Plaintiff incorporates by reference, as if fully set forth herein, the facts set forth in paragraphs 1–61 above.

62. Defendant acted with intentional disregard of Plaintiff's rights by intentionally interfering with Plaintiff's contractual relationship with Bharat in instructing Bharat to terminate its business relationship with Plaintiff and to cut Plaintiff out of their business relationship.

63. Upon information and belief, Defendant's actions were motivated by the desire to avoid paying any premium on Bharat's gear prices included to account for Plaintiff's commission.

64. Defendant further fraudulently represented that Plaintiff would receive a commission for its work in finding a new gears manufacturer.

65. As a result, an award of punitive damages for Counts I and III is appropriate under Wis. Stat. § 895.043(3), in an amount to be determined at trial.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays that the Court:

1. Enter a judgement on Count I of the Complaint in favor of Plaintiff and against Defendant and award damages for tortious interference with contractual relations in an amount equivalent to the commission Plaintiff is owed, to be proven at trial.

2. Enter a judgement on Count II of the Complaint in favor of Plaintiff and against Defendant and award damages for civil conspiracy in an amount equivalent to the commission Plaintiff is owed, to be proven at trial.

3. Enter a judgement on Count III of the Complaint in favor of Plaintiff and against Defendant and award damages for fraud in an amount equivalent to the commission Plaintiff is owed, to be proven at trial.

4. Enter judgement on Count IV of the Complaint in favor of Plaintiff and against Defendant and award damages for unjust enrichment in an amount equivalent to the value of the benefits conferred by Plaintiff on Defendant.

5. Enter judgement on Count V in favor of Plaintiff and against Defendant and award Plaintiff punitive damages on Counts I and III as permitted by Wis. Stat. § 895.043.

6. Award Plaintiff prejudgment interest, attorneys' fees, and costs.

7. Award Plaintiff such other, further, and additional relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by twelve jurors on all claims so triable.

Respectfully submitted this 28th day of February 2022.

14

Case 2:22-cv-00250-LA   Filed 02/28/22   Page 14 of 15   Document 1

*Electronically signed by Javier H. Rubinstein (pro hac vice forthcoming)*
Javier H. Rubinstein (*pro hac vice forthcoming)*
Julia Zousmer (*pro hac vice forthcoming*)
Michael A. Lombardo (*pro hac vice forthcoming*)
KING & SPALDING LLP
110 N. Wacker Drive
Suite 3800
Chicago, IL 60606
Tel: +1-312-995-6333
jrubinstein@kslaw.com
jzousmer@kslaw.com
mlombardo@kslaw.com

Daniel M. Janssen  (SBN 1022112)
QUARLES & BRADY LLP
411 East Wisconsin Avenue
Suite 2400
Milwaukee, Wisconsin 53202
Tel: +1 (414) 277-5733
daniel.janssen@quarles.com

*Attorneys for Plaintiff*